Filed 3/5/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO;<br><br>     Respondent;<br><br>LEE FARLEY,<br><br>     Real Party in Interest. | A168018<br><br>(San Francisco City & County Super. Ct. No. 23000776) |

In the action below, the People allege that, on January 9, 2015, defendant Lee Farley shot and killed four young men sitting in a car in San Francisco's Hayes Valley neighborhood. The prosecution's theory of the case is that it was a drive-by shooting committed for the benefit of "Page Street," which the People allege is a "criminal street gang" under Penal Code[1] section 186.22, subdivision (f) (section 186.22(f)). The superior court ruled that the People had not satisfied their burden at the preliminary hearing to present evidence that Page Street is sufficiently "organized" to qualify as criminal street gang.

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

1

(§ 186.22(f).) Because we conclude the People met their burden, we grant a writ of mandate directing the superior court to vacate its order setting aside the gang-related count, allegations, and enhancements against Farley.

**BACKGROUND**

## I. Procedural history

A complaint filed on January 19, 2023, in the Superior Court for the City and County of San Francisco charged Farley with four counts of murder. (§ 187, subd. (a).) Attached to each count of murder were three special circumstance allegations: discharge of a firearm from a motor vehicle (§ 190.2, subd. (a)(21)); murder by an active participant in a criminal street gang to further the activities of the gang (§ 190.2, subd. (a)(22)); and multiple murders (§ 190.2, subd. (a)(3)). The complaint further alleged various firearm use enhancements to each count of murder, including that the use of a firearm was for the benefit of a criminal street gang. (§§ 12022.5, subd. (a); 12022.53, subds. (b)–(e).) Counts five and six charged Farley with firearm-related offenses (§§ 246; 29800, subd. (a)(1)), and the first six counts all alleged that Farley had committed the offenses for the benefit of a criminal street gang. (§ 186.22, subd. (b).) Count seven charged Farley with the substantive offense of participation in a criminal street gang (§ 186.22, subd. (a)), along with firearm-related enhancements (§§ 12022.5, subd. (a); 12022, subd. (a)(1)). Finally, the complaint contained allegations regarding various aggravating circumstances pursuant to California Rules of Court, rule 4.421 and Farley's

2

prior convictions within the meaning of sections 667, subdivisions (a)(1), (d), and (e), and 1170.12, subdivisions (b) and (c).

At the conclusion of the preliminary hearing, the magistrate held Farley to answer on all the charges, allegations, and special circumstances in the complaint. The information charged Farley consistently with the complaint.

Farley moved to set aside the information under section 995 on various grounds, and he demurred to the aggravating factors alleged in the information. As relevant here, Farley argued that the prosecution had failed to establish that Page Street, the alleged criminal street gang that the charged offenses were purportedly intended to benefit, was "organized" within the meaning of section 186.22(f)'s definition of a "criminal street gang" as an "ongoing, organized association or group." The People opposed the motion to set aside and the demurrer.

The superior court denied the section 995 motion in part and granted it in part. The court granted the motion as to count seven, the substantive offense of participation in a criminal street gang (§ 186.22, subd. (a)), and as to all the gang-related special circumstances, enhancements, and allegations associated with counts one through six. The court reasoned that the People had failed to prove that Page Street is "organized," as required by section 186.22(f). Accordingly, the court dismissed the substantive gang offense in count seven as well as all gang-related special circumstances, enhancements, and allegations.

The court denied the motion to dismiss in all other respects, and it overruled the demurrer to the special allegations.

With trial set to begin on the remaining counts three days after the court's ruling, the People immediately filed a notice of appeal and asked the superior court to stay the trial while the People pursued their appeal and a writ petition. The superior court continued the trial date for three days. The People filed a writ petition in this court seeking a writ of mandate directing the superior court to vacate its order partially granting Farley's section 995 motion or, in the alternative, a writ of supersedeas staying Farley's jury trial until this court could decide the People's appeal of the superior court's order. The People also asked this court to stay Farley's jury trial until issuance of a decision on the appeal or writ petition. We temporarily stayed the trial and requested briefing. After receiving briefing, we issued an order to show cause and ordered the stay of trial to remain in place pending further order of the court. We also stayed further briefing in the People's appeal of the same order with the expectation that the appeal would be dismissed as moot upon the issuance of the remittitur in this case.

## II.    Relevant facts from the preliminary hearing

The sole issue before this court is whether, at the preliminary hearing, the People presented evidence that Page Street is "organized" within the meaning of section 186.22(f) in a quantum sufficient to withstand a section 995 motion to dismiss. We therefore limit our recitation of the factual background of this case to the evidence presented at the preliminary hearing bearing

4

upon that question. Almost all of the relevant testimony came from San Francisco Police Sergeant Damon Jackson, whom the magistrate accepted as an expert with respect to investigations into criminal street gangs, investigation of crimes involving criminal street gangs in the Western Addition of San Francisco, and criminal street gang culture in San Francisco.

Page Street, also referred to as Page Street Mob, was one of four to five criminal street gangs active in the Western Addition around January 2015. Other gangs then active included Mac Block, Eddy Rock, and Chopper City. Page Street's rivals or enemies were Mac Block and Potrero Hill. Three of the four victims of the charged shooting in the underlying case were known to law enforcement as members or associates of Mac Block.

Page Street also goes by other names, such as Zone 4 and Zone 6. Page Street's symbols are the numbers 4, 400, and 6, which appear in tattoos, social media handles and hashtags, and in hand signs. For example, Sergeant Jackson testified that he had seen an individual with a tattoo of "400" on the hand, and he had seen tattoos of "4's up, P's down," with the "P down" referring to the number 6. These names and symbols refer to the 400 block of Rose Street and the 600 block of Linden Street. Those areas are Page Street's "turf" or "safety zone," which means the area over which a gang claims control and where they feel safest.

San Francisco's gangs are generally street-based gangs, but that does not mean that the members live on the street associated with the gang. Of the Western Addition gangs, one

5

(CDP) is not directly associated with public housing, but other criminal street gangs in San Francisco largely have their safety zones located near public housing. Most people associated with criminal street gangs leave or want to leave the areas of public housing associated with criminal street gangs because the environment is very dangerous for them. But they often come back to the area even after moving away and conduct themselves in the same way as when they lived there.

A successful federal RICO prosecution directed at gang members in the early 2000s took out a generation of Page Street gang members, leaving a membership vacuum that younger members began to fill. In January 2015, there were approximately 10 active members of Page Street.

Sergeant Jackson described the organization of Page Street as "generally informal but organized." It is organized in the sense of members having particular roles to successfully complete the crimes the gang commits. Page Street did not have leaders in the sense of everyone responding to orders from one individual, but some members had a larger voice and more influence. A member may have more influence because they have money, knowledge on how to make money, or knowledge of how to acquire things necessary for the gang to commit crimes, such as firearms. Not everyone who lives in a gang's turf or safety area is a member of that gang, nor does associating with members of the gang necessarily make a person a gang associate. It requires a certain level of activity with the gang to make a person an associate, and another level of activity to bring a person to the

6

member level.  Page Street's primary activities from 2013 to January 2015 were theft, burglary, assault, possession of firearms, and robbery.

Younger members who are trying to elevate their status in a gang like Page Street start off with property crimes like car burglaries and then increasingly commit more serious crimes like residential burglaries, home invasions, and assaults or shootings. Gang members have specifically said they needed to "catch a body" to elevate their status.  Trust is an important aspect of committing crimes with other gang members, since trust allows gang members to commit crimes together, which facilitates the success of the crime.  Older gang members will teach younger gang members how to conduct themselves and how to make money.  Gang members use phrases like "put me on" or "I put someone on" to refer to the type of relationship by which an older member teaches a younger member how to commit crimes for profit.

Testifying about one photograph from a social media account attributed to Farley, Sergeant Jackson identified and described Page Street members or affiliates displaying hand signs or tattoos associated with Page Street.[2]  In reviewing an

---

[2] Farley objects to the gang expert's reliance on social media posts that he claims lacked foundation and proper authentication, among other things.  We discern no abuse of discretion in the court allowing the social media posts to be admitted into evidence at the preliminary hearing.  (*People v. Waidla* (2000) 22 Cal.4th 690, 717 [evidentiary rulings reviewed for abuse of discretion]; *People v. Valdez* (2011) 201 Cal.App.4th

account associated with Lavontae Farley — Farley's brother and a member of Page Street — Sergeant Jackson identified defendant Farley displaying a hand sign signifying the number 6.

Within hours after the homicides at issue in this case, there was a video on social media of a Page Street member, Raydell H., displaying a yellow bandana.[3] Mac Block gang members are associated with the color yellow, so it would be a sign of disrespect for members of Page Street to display the yellow bandana after the murder of victims associated with Mac Block.

Finally, Sergeant Jackson described a YouTube music video titled "Zone Life," featuring a number of Page Street members displaying firearms. The main lyric in that video is, "You took one. We took four. Watch and we're gonna get some more." Sergeant Jackson believed "one" referred to the victim of an earlier murder attributed to Mac Block and "four" referred to the homicide victims in the underlying case. Making the video publicly accessible on YouTube put Page Street's rivalry with Mac Block on display and exacerbated it. In another music video titled "Gang," several Page Street members described themselves as "Page Street young'ns," displayed firearms, and kept saying, "Gang." Sergeant Jackson testified that the Page Street

_____

1429, 1435 [social media post's authenticity may be established by its contents or other circumstantial evidence].)

[3] The magistrate ordered testifying witnesses to use first name and last initial when referring to individuals who were juveniles at the time of the incident regarding which the witness was testifying.

8

members repeatedly saying the word "gang" was relevant because they were saying they were a gang.

## DISCUSSION

### I. Propriety of writ review

An order granting a section 995 motion, in whole or in part, is appealable. (§ 1238, subd. (a)(1).) Indeed, the People filed a timely notice of appeal in case number A168183. However, they also seek relief in this separate writ proceeding, either in the form of a writ of mandate directing the superior court to vacate the challenged order and deny the section 995 motion in its entirety or, alternatively, a writ of supersedeas to stay the trial pending the resolution of the appeal.

In order to justify extraordinary writ relief, a petitioner must establish that there is no adequate remedy at law and that the petitioner will suffer irreparable injury if the writ is not granted. (*Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 299–300.) Here, the threatened injury is clear. Absent immediate relief, the People will be forced to proceed to trial on the charges that remain after the partial grant of the section 995 motion. (§ 1242 [appeal by the People does not stay judgment in favor of defendant]; *People v. Bogart* (1970) 7 Cal.App.3d 257, 263–264 [People's appeal of dismissal of some counts did not affect trial court's jurisdiction over remaining unaffected counts].) If the People are entitled to reinstatement of the dismissed charges and enhancements, and assuming Farley is convicted of some or all of the underlying charges in the first trial, the People would be forced to conduct a

9

second trial limited to the gang-related charges and enhancements. (*People v. Anderson* (2009) 47 Cal.4th 92, 119– 124 [separate retrial limited to penalty allegations is authorized].) Any such trial would require much the same evidence offered in the first trial to be presented to a second trier of fact. (See *People v. Superior Court* (*Caudle*) (1990) 221 Cal.App.3d 1190, 1193, fn. 2 [writ review appropriate to avoid multiple trials involving the same facts].)

Farley contends there is no irreparable harm because the gang charges and enhancements would be bifurcated from the remaining charges even if they were reinstated. (See § 1109.) This argument is unpersuasive. As an initial matter, the bifurcation of gang-related charges required by section 1109 upon a defendant's request does not apply to the gang-related special circumstances charged under section 190.2, subdivision (a)(22). (*People v. Montano* (2022) 80 Cal.App.5th 82, 111–114.) That aside, even if the gang charges and enhancements were bifurcated from other substantive offenses, the entire case would still be decided by the same trier of fact. That would not be the case if the People were required to try the gang charges and enhancements in a separate trial. Further, wholly apart from the concern about multiple trials, it may be necessary to resolve the question of whether Page Street qualifies as a criminal street gang under section 186.22(f) in order to assess, at the trial of the substantive offenses, the admissibility of evidence of motive, intent, or other relevant facts under Evidence Code section 1101,

subdivision (b).  The People have thus met their burden to show irreparable harm absent writ relief.

The question of whether the People lack an adequate remedy at law is a closer one.  Ordinarily, a remedy by immediate appeal is presumed to be adequate.  (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 113.)  However, notwithstanding the right to immediately appeal an order partially granting a section 995 motion, there have been instances in which appellate courts have concluded writ relief is appropriate to reverse an order that erroneously dismisses a portion of an information or indictment.  (See *People v. Superior Court* (*Bolden*) (1989) 209 Cal.App.3d 1109, 1112; *People v. Superior Court* (*Caudle*), *supra*, 221 Cal.App.3d at pp. 1192–1193 & fn. 2; *People v. Superior Court* (*Day*) (1985) 174 Cal.App.3d 1008, 1011, fn. 1; *People v. Superior Court* (*Gibson*) (1980) 101 Cal.App.3d 551, 555.)  The rationale for these decisions, whether explicit or implicit, was that review by writ under the circumstances obviated the need for multiple trials involving the same facts and avoided unduly delaying the matter.  (*People v. Superior Court* (*Bolden*), at p. 1112 [writ of mandate avoids delay and unwarranted complications]; *People v. Superior Court* (*Caudle*), at pp. 1192–1193 & fn. 2 [writ of mandate avoids need for multiple trials]; *People v. Superior Court* (*Day*), at p. 1101, fn. 1; *People v. Superior Court* (*Gibson*), at p. 555 [peremptory writ of mandate in first instance avoids delay].)  Both considerations apply here as well.  In most cases, an appellate court could achieve a prompt resolution in situations like this one without the need for writ

11

relief by expediting the appeal and staying the trial. Here, however, by the time briefing commenced in the related appeal, briefing in this writ proceeding was already complete. No purpose would be served by requiring the parties to brief issues in the appeal that have already been thoroughly addressed in this writ proceeding. It would accomplish nothing but further delay and requiring a second trial on the same facts. Accordingly, under the unique circumstances of this case, it is appropriate to resolve this matter by writ, which functionally treats the writ proceeding as if it were an expedited appeal.[4]

## II.  Legal principles and standard of review

A defendant may seek to set aside an information under section 995 when a magistrate commits the defendant to stand trial "without reasonable or probable cause." (§ 995, subd. (a)(2)(B).) " ' " 'Reasonable or probable cause' means such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." ' " (*People v. Mower* (2002) 28 Cal.4th 457, 473.) " ' "[T]he showing required at a preliminary hearing is exceedingly low." ' " (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 544.) Accordingly, " '[w]e will not set aside an information "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is

---

[4] The People could have accomplished the same thing by moving for calendar preference and an accelerated briefing schedule in the appeal. As we indicated in our prior order in this case, upon issuance of the remittitur in this case we will dismiss as moot the People's appeal of the trial court's section 995 order.

guilty of it" ' " (*id*. at p. 545), meaning that "an indictment or information should be set aside only when there is a total absence of evidence to support a necessary element of the offense charged." (*People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 1226.)

In reviewing an order granting a section 995 motion, we disregard the superior court's ruling and examine only the magistrate's decision holding the defendant to answer. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.) "[W]e must uphold the magistrate's express or implied findings if they are supported by substantial evidence." (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.) " 'Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information.' " (*Bom v. Superior Court* (2020) 44 Cal.App.5th 1, 11.) Where the facts are undisputed, the determination of probable cause "constitute[s] a legal conclusion which is subject to independent review on appeal." (*People v. Watson* (1981) 30 Cal.3d 290, 300.)

## III. Interpreting "organized" in section 186.22(f)

The California Street Terrorism Enforcement and Prevention Act, also known as the STEP Act, was enacted in 1988 to target crimes committed by violent street gangs. (§§ 186.20 et seq.; see *People v. Renteria* (2022) 13 Cal.5th 951, 962.) Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), also known as the STEP Forward Act of 2021, amended the statutory scheme in various respects, including by modifying the definition of "criminal street gang" in

13

section 186.22(f). (Stats. 2021, ch. 699, § 3.) As amended by Assembly Bill 333, section 186.22(f) defines "criminal street gang" as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." The superior court dismissed the gang-related count, special circumstances, enhancements, and allegations because it agreed with Farley that Page Street is not "organized" within this definition. Our tasks are therefore (1) to ascertain what the Legislature intended by requiring an association or group to be "organized" to qualify as a criminal street gang, and then (2) to determine whether the prosecution's proof as to that aspect of section 186.22(f) meets the " ' "exceedingly low" ' " bar at a preliminary hearing. (*Zemek v. Superior Court, supra,* 44 Cal.App.4th at p. 544.)

"The principles of statutory construction are well established. 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' [Citation.] In approaching this task, we 'must first look at the plain and commonsense meaning of the statute because it is generally the most reliable indicator of legislative intent and purpose.' [Citation.] 'If there is no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said, and we need not resort to

14

legislative history to determine the statute's true meaning.' " (*People v. Skiles* (2011) 51 Cal.4th 1178, 1185.) If, however, "the statutory language may reasonably be given more than one interpretation, ' " 'courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.' " ' " (*People v. King* (2006) 38 Cal.4th 617, 622.)

We begin with the statute's plain language, specifically section 186.22(f)'s definition of a "criminal street gang" as "an ongoing, *organized* association or group of three or more persons, *whether formal or informal . . . .*" (Italics added.) The term "organized" is not defined in the statute. One dictionary defines "organized," as relevant here, as "having a formal organization to coordinate or carry out joint activities." (Webster's 3d New Internat. Dict. (2002) p. 1590.) Other dictionaries' definitions of "organized" are similar. (E.g., American Heritage Dict. (4th ed. 2000) p. 1239 ["[f]unctioning within a formal structure, as in the coordination and direction of activities"]; Random House Webster's College Dict. (2nd rev. 2001) p. 934 ["having an organization or structure for directing widespread activities"].) These definitions suggest that to qualify as a criminal street gang, a group or association must have some type of structure to coordinate or carry out the gang's activities in common. However, the statute qualifies its use of "organized" by noting that a criminal street gang may be formal or informal. (§ 186.22(f).) This indicates that, notwithstanding those

15

dictionaries that define "organized" as having a formal organization or structure, an association or group's structure or coordination need not be formal.

The terms of the statute offer little guidance concerning what it means for an association or group to be organized informally. The statute's history and its interpretation by our Supreme Court offer some insight. Before Assembly Bill 333, section 186.22, former subdivision (f) defined a "criminal street gang" in relevant part as "any ongoing organization, association, or group of three or more persons, whether formal or informal . . . ." (§ 186.22, former subd. (f); Stats. 2017, ch. 561, § 178.) Assembly Bill 333 replaced "ongoing organization, association, or group" with "ongoing, organized association or group." (Compare § 186.22, subd. (f), as amended by Stats. 2017, ch. 561, § 178 with § 186.22(f).) On its face, this change — from using "organization" as an alternative to "association" or "group," to using "organized" to modify "association or group" — raises the possibility that Assembly Bill 333 intended to increase the level of organization required for a group to qualify as a criminal street gang. Importantly, however, Assembly Bill 333 left unchanged the qualifier that a criminal street gang may be a "formal or informal" association or group. (Compare § 186.22, former subd. (f), as amended by Stats. 2017, ch. 561, § 178 with § 186.22(f).) This suggests that whatever other effects Assembly Bill 333 had on the law relating to criminal street gang offenses, it did not intend to make a dramatic change to section 186.22(f).

16

The Supreme Court's analysis of section 186.22, former subdivision (f) (Stats. 2017, ch. 561, § 178) in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*) confirms that Assembly Bill 333's addition of "organized" to section 186.22(f) was relatively modest in effect. *Prunty* considered what must be shown to establish the existence of a single, large criminal street gang when proof of the overarching gang's existence turns on the conduct and existence of different gang subsets. (*Prunty,* at p. 71.) In addressing this question, the court examined at length the definition of "criminal street gang" in section 186.22, former subdivision (f) and specifically considered "what it means to constitute an 'organization, association, or group.' " (*Prunty*, at p. 71.)

Notably, in construing the meaning of the terms " 'association' " and " 'organization,' " *Prunty* relied on dictionary definitions emphasizing that such entities must be " 'organized.' " (See *Prunty*, *supra*, 62 Cal.4th at p. 72 [citing definitions of an " 'association' " as " '[a]n organized body of people who have an interest, activity, or purpose in common' " and an " 'organization' " as " '[a] group of persons organized for a particular purpose' "].) The court acknowledged that the definitions of the term "group" might be construed to "encompass broader collections of people" with a looser relationship than an "association" or "organization." (*Id*. at p. 73.) However, it reasoned that, under the *noscitur a sociis* canon of construction (by which "a word literally 'is known by its associates' "), the meaning of "group" in section 186.22, former subdivision (f) (Stats. 2017, ch. 561, § 178) was "generally similar to—and at

17

least no broader than" the other terms. (*Prunty*, at p. 73.) Therefore, like the terms "association" and "organization," the term "group" as used in section 186.22, former subdivision (f) connoted persons organized in a shared venture. (*Prunty*, at p. 73.) *Prunty* also emphasized that the Legislature had declared in the original STEP Act that its focus was on " 'the *organized* nature of street gangs' " as well as "the accompanying 'patterns of criminal gang activity.' " (*Prunty*, at p. 74, citing § 186.21, italics added.)

However, *Prunty* explained that the qualifying terms "formal or informal" in the definition of "criminal street gang" suggested it was not necessary to show "the stereotypical organized crime syndicate's hierarchical, tightly organized framework." (*Prunty*, *supra*, 62 Cal.4th at p. 73.) The court observed that "formal groups may often reflect well-defined membership criteria, a discernible hierarchy, predictable meeting schedules and locations, fixed membership groups, and codified rules and order. Informal groups, by contrast, will rarely if ever display these characteristics. They need not exhibit an identifiable hierarchy; their membership composition may be fluid; the boundaries of their 'turf' may be porous; and their methods of communication may be variable. But, they must still be united by something in common beyond pure happenstance." (*Ibid*.) Thus, while *Prunty* required an "organization, association, or group" under section 186.22, former subdivision (f) (Stats. 2017, ch. 561, § 178)to be organized, it did not require a formal degree of organization.

18

*Prunty* proceeded to describe what types of evidence would suffice to establish the existence of an informal organization, at least in the context of showing that individual subsets are part of a larger group: "[C]ollaboration among subset members, long-term relationships among members of different subsets, use of the same 'turf,' [and] behavior demonstrating a shared identity with one another . . . ." (*Prunty*, *supra*, 62 Cal.4th at p. 73.) *Prunty* cautioned that the law indicated that "a group must be united by more than shared colors, names, and other symbols." (*Id.* at p. 74.) *Prunty* also stated that there must be evidence of common activities rather than just shared viewpoints and noted that proof of a group's common enemy or loose common ideology was insufficient. (*Id.* at p. 75.)

Farley acknowledges that, while *Prunty* mostly focused on gang subsets, the same considerations apply to defining the very existence of a gang. Consequently, Assembly Bill 333's use of the term "organized" arguably did nothing more than codify *Prunty*'s articulation of the existing state of the law or clarify that *Prunty*'s rationale applied beyond the gang subset context. But even if Assembly Bill 333's addition of the word "organized" should be viewed as a substantive change requiring all groups or associations to be "organized" to qualify as criminal street gangs, it remains the case that a "criminal street gang" under section 186.22(f) may be formal or informal. The same types of evidence *Prunty* indicated would be sufficient proof of informal organization in the context of gang subsets — collaboration, long-term relationships, use of the same turf, and behavior

19

demonstrating a shared identity — therefore also suffice to show the types of associational ties that would support a finding that an informal association or group is sufficiently "organized" to qualify as "criminal street gang" under section 186.22(f).

Farley urges that Assembly Bill 333's legislative findings and declarations add important context to the word "organized," suggesting that the Legislature intended a much narrower definition of a gang.[5]  In particular, he relies on the following uncodified finding in Assembly Bill 333:  "The social networks of residents in neighborhoods targeted for gang suppression are often mischaracterized as gangs despite their lack of basic organizational requirements such as *leadership*, *meetings*, *hierarchical decisionmaking, and a clear distinction between members and nonmembers*."  (Stats. 2021, ch. 699, § 2,

---

[5] Farley also argues more generally that the Legislature intended Assembly Bill 333 to dramatically limit the scope of the gang enhancement.  (See *People v. Rojas* (2023) 15 Cal.5th 561, 565 [Assem. Bill 333 "substantially narrowed § 186.22(f)'s definition of 'criminal street gang' "].)  This general observation about the effect of the legislation as a whole, however, does not mean that each individual modification within Assembly Bill 333 must be interpreted to significantly narrow the statute's application.  The language at issue is just one of many changes effected by Assembly Bill 333.  (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206 [listing four main areas of statutory changes enacted by Assem. Bill 333].)  Our analysis is limited to the statutory change requiring that a gang be an "ongoing, *organized* association or group of three or more persons." (§ 186.22(f), italics added.)  We have no occasion to consider the impact of other statutory changes included within Assembly Bill 333 or the effect of the legislation on the scope of the gang enhancement as a whole.

20

subd. (d)(8), italics added.)  According to Farley, a group that is "organized" should possess all these markers of an organization. Farley's reliance on uncodified legislative findings is unpersuasive.

Uncodified legislative findings may serve as an interpretive tool when a statutory provision is otherwise unclear after considering its text, structure, and related statutory provisions. (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 156–157.) But such findings " ' " 'do not confer power, determine rights, or enlarge the scope of [the] measure' " ' " (*People v. Flores* (2020) 44 Cal.App.5th 985, 995) and are "*not* intended to be a substantive part of the code section or general law that the bill enacts . . . ." (*People v. Allen* (1999) 21 Cal.4th 846, 858–859, fn. 13, italics added; accord 1A Sutherland, Statutory Construction (7th ed. 2023) § 20:3).  Above all, they cannot be relied upon as an interpretive tool when they contradict the statute's plain language, as they do here.

The organizational factors listed in the legislative finding Farley cites, such as leadership and hierarchical decisionmaking, are examples of *formal* organizational structure.  (See, e.g., *Prunty*, *supra*, 62 Cal.4th at p. 73 [listing discernible hierarchy, predictable meeting schedules, fixed membership, and codified rules as hallmarks of formally organized groups].)  Interpreting "organized" to require a showing that a group must possess these characteristics of a formal organization would directly contradict the language of section 186.22(f) specifying that a criminal street gang may be "formal or informal."  Another division of this court

21

recently came to the same conclusion, relying on the Legislature's retention of the "formal or informal" modifying language to reject the argument that characteristics like those identified in Assembly Bill 333's findings were required for a group to qualify as a "criminal street gang" under the amended statute. (*People v. Campbell* (2023) 98 Cal.App.5th 350, 381 & fn. 24.) Farley's proposed interpretation of "organized" would render "formal or informal" meaningless, in violation of the rule of statutory construction that "direct[s] us to avoid, if possible, interpretations that render a part of a statute surplusage." (*People v. Cole* (2006) 38 Cal.4th 964, 981.)

Furthermore, in the course of amending Assembly Bill 333 before it was ultimately approved, the Legislature rejected language for section 186.22(f) that would have required a showing of formal organization to establish the existence of a "criminal street gang." Specifically, as introduced, Assembly Bill 333 would have amended section 186.22(f) to define a "criminal street gang" as a "ongoing organization, association, or group . . . *with an established hierarchy* . . . ." (Assem. Bill 333, § 1, as introduced Jan. 27, 2021, italics added.) The committee report when Assembly Bill 333 was introduced indicates that the Legislature intended this language to abrogate *Prunty*. (Assem. Com. on Public Safety, Rep. on Assem. Bill 333, as amended Mar. 30, 2021, p. 5.) That report quotes *Prunty*'s statement that "gangs may constitute loosely coupled, amorphous organizations" and that prosecutors need not "show that these groups resemble formally structured, hierarchical enterprises such as businesses

22

or professional associations" and then notes that the bill would have required proof of organization in the form of an established hierarchy.  (*Ibid.*)  But later in the drafting process, even as it added the finding on which Farley relies, in Assembly Bill 333's substantive provisions the Legislature replaced the requirement of "an established hierarchy" with the "ongoing, organized association or group" language.  (Assem. Amend. to Assem. Bill 333, May 28, 2021.)  "As a general principle, the Legislature's rejection of specific language constitutes persuasive evidence a statute should not be interpreted to include the omitted language." (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 985.) Consequently, we reject the suggestion that that term "organized" in section 186.22(f) should be interpreted to require formal hallmarks of organizational structure, such as an established hierarchy or the formal organizational characteristics cited in the uncodified legislative findings.  We construe the Legislature's rejection of the "established hierarchy" language that would have abrogated *Prunty* as an implicit endorsement of *Prunty*'s analysis regarding proof of informal organization.

Our Supreme Court's recent decision in *People v. Clark* (Feb. 22, 2024, S275746) ___ Cal.5th ___ [2024 Cal. Lexis 774] (*Clark*) supports this interpretation.  *Clark* quoted Assembly Bill 333's legislative findings and declarations in the course of analyzing Assembly Bill 333's requirement that a criminal street gang's members "collectively" engage in a pattern of criminal gang activity.  (*Clark,* at *21.)  The court concluded that Assembly Bill 333 used both " 'collectively' " and " 'organized' " "in

23

service of the Legislature's broader goal of differentiating between the threat posed by organized groups collectively engaged in criminal activity, versus the threat posed by individual, loosely connected persons who happen to commit crimes." (*Clark*, at \*23–\*24.)  *Clark* therefore held that the amended statute now requires proof of an "organizational nexus" in the form of "evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles." (*Id.* at \*25.)  However, *Clark* cautioned that it did "not mean to overstate the degree of formality required" to show an organizational nexus, recognizing that "some gangs have a ' "loose" ' structure" or "loosely defined goals and principles," while others have "a 'well-defined' hierarchy" or "clearly defined missions." (*Id.* at \*25–\*26.)  Given *Clark*'s conclusion that Assembly Bill 333 used "organized" and "collectively" to serve the same legislative purpose, *Clark*'s observation applies with equal force here and confirms our view that the term "organized" under section 186.22(f) does not require proof of specific elements demonstrating a formal organizational structure.

Amicus curiae Peace and Justice Law Center urges that this court adopt a "workable standard" to establish when an association or group qualifies as "organized" within the meaning of section 186.22(f).  Specifically, amicus argues that prosecutors should have the burden of proving "that (1) the gang distinguishes between members and non-members, (2) that the gang is able to make collective decisions or ratify the acts or

24

decisions of members, and (3) the evidence of organization must support the alleged scale and complexity of the gang."

While the factors identified by amicus may bear upon whether an association or group is "organized" under section 186.22(f), we decline to adopt a rigid set of organizational criteria that must be established in all cases in order to satisfy the statute's requirements.[6] The statute does not explicitly or implicitly require a gang to have any particular type of organizational structure, but instead provides generally that a gang structure may be formal or informal. Given this expansive statutory language, there is no single way to demonstrate the organizational structure section 186.22(f) requires. (See *Prunty*, *supra*, 62 Cal.4th at p. 77 [court did "not intend to place limits on the theories that the prosecution may advance in attempting to show that various neighborhood-based groups in fact constitute a single 'criminal street gang' "].) There are many different factors that tend to establish a group is organized, and those factors may exist to a greater or lesser degree in each case depending upon the informal or formal organization of the group, the size of the group, and other considerations. For that reason, prosecutors should not be limited in the theories they may advance to prove that an association or group is organized within the meaning of

---

[6] We note, however, that Sergeant Jackson testified regarding the differentiation between Page Street members, associates, and non-members. And as further detailed below, Jackson's additional testimony was more than sufficient to establish the existence of an "informal" organization at this stage of the proceedings. (See section IV, *post*.)

25

section 186.22(f). (Cf. *Clark*, *supra*, ___ Cal.5th ___ [2024 Cal. Lexis 774 at *26] [given the "variability" in formality of gangs' organizational structures, "collective engagement will be established in different ways"].)

## IV. Evidence supporting conclusion that Page Street is organized

With this understanding of the statute and bearing in mind the "low evidentiary bar" to establish probable cause in opposition to a section 995 motion, we have no difficulty concluding there is sufficient evidence that Page Street is organized within the meaning of section 186.22(f) to allow the prosecution to proceed. (*People v. Scully* (2021) 11 Cal.5th 542, 582.)

Sergeant Jackson opined that Page Street was a gang in 2015, when the alleged crimes were committed. As the basis for this opinion, Sergeant Jackson explained that Page Street is "informal but organized" and its members have changed over time, but it is a longstanding organization that had 10 members in 2015. Page Street has different names (including Zone 4 and Zone 6), a defined gang safety zone or "turf," symbols (4, 400, and 6), hand signs, and common enemies. Sergeant Jackson distinguished between members, associates, and those not affiliated with Page Street based upon the individuals' level of activity with the gang. Page Street does not have leader roles in the sense of one individual giving instruction and other members responding. But some members have greater influence, which comes from having money, knowing how to make money, or

knowing how to acquire things necessary for the gang to commit crimes, such as firearms.

Page Street is also organized in the sense that members have particular roles to play in carrying out crimes together. According to Sergeant Jackson, younger members of Page Street, like other gangs, elevate their status by committing increasingly serious crimes, such as transitioning from burglaries to home invasion. Older members of a gang will teach younger members how to conduct themselves and make money. Gang members will use phrases such as "put me on" or "I put someone on" to describe this type of relationship. Like other gangs, members of Page Street split the proceeds of its crimes. As evidence of this for Page Street, Sergeant Jackson cited videos in which gang members displayed hundreds of thousands of dollars in cash collectively, despite the fact that they had never been employed. And as noted, Sergeant Jackson testified that in one music video exhibit introduced into evidence, several Page Street members described themselves as "Page Street young'ns," displayed firearms, and expressly described themselves as a "gang."

Taken together, this evidence supports the existence of an informally organized group that is "united by something in common beyond pure happenstance." (*Prunty*, *supra*, 62 Cal.4th at p. 73; see *id.* at p. 79 [prosecution can demonstrate subsets are part of same gang with evidence that they "mutually acknowledge one another as part of that same organization"]; *Rodas-Gramajo v. Superior Court* (2023) 92 Cal.App.5th 656, 666–667 [at preliminary hearing, prosecution "mostly

established" that a group qualified as a "criminal street gang" under § 186.22(f) by presenting evidence of the group's history, number of members, identifying signs and symbols, and criminal activities; remand under § 995a was necessary only for prosecution to address other new elements Assembly Bill 333 added to § 186.22], disapproved on another ground by *Clark*, *supra*, ___ Cal.5th ___ [2024 Cal. Lexis 774 at *30, fn. 8].)

Farley complains that Sergeant Jackson mistakenly focused on whether the *crimes* were organized instead of whether the *association or group* was organized. This argument lacks merit. What we have here is far more than a collection of individuals who happen upon opportunities to commit crimes together randomly or in ad hoc ways. Contrary to Farley's contention, the testimony offered by Sergeant Jackson bearing upon the group's associational ties was not limited to the organized or collaborative nature of the crimes. In any event, evidence that members of a group play defined roles in committing their crimes tends to show the existence of an organizational relationship within the group. (See *Prunty*, *supra*, 62 Cal.4th at pp. 78–79 ["In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang"]; cf. *Clark*, *supra*, ___ Cal.5th ___ [2024 Cal. Lexis 774 at *26–*27] [collective engagement may be shown by evidence that members play different specific roles in gang's crimes].) When a group lacks a structured, identifiable hierarchy or similarly formal

28

signs of organization, it may be appropriate to consider whether the group's conduct manifests the hallmarks of an organized group. (See *Prunty*, *supra*, 62 Cal.4th at p. 78 [when "formal structure or hierarchy" is not present, evidence of collaboration and shared activity between members of different subsets of a gang, such as evidence that members " 'work[ed] in concert to commit a crime' " or "strategized, formally or informally, to carry out their activities," will permit the inference that the subsets have an informal relationship].)

A street gang for purposes of Assembly Bill 333 can hardly be expected to declare publicly that it is formally organized in the way that a licensed business organization does, thereby allowing the public to identify it and hold its members responsible for its activities. As a result, evidence that a group's crimes are organized is directly relevant to the question of whether the group itself is organized. Moreover, conduct has always been the basis for imposing enhanced penalties on members of criminal street gangs, for "the STEP Act punishes *conduct*, not association." (*People v. Loeun* (1997) 17 Cal.4th 1, 11.)

Considered as a whole, Sergeant Jackson's testimony demonstrates (i) differentiation between Page Street members and non-members; (ii) certain Page Street members having more influence than others; (iii) a division of roles among Page Street members that facilitates successful, coordinated completion of crimes; (iv) discernible criteria for Page Street members to elevate their status within the organization; and (v) discernible methods of passing on criminal know-how from more experienced

29

to less experienced members.  While other factors and evidence may be relevant in other cases (including, for example, gang members' use of coded language for surreptitious communication), at this stage of the proceedings, the prosecution's evidence in this case amply supports an inference that Page Street has a sufficient level of operational structure to qualify as an "informal" organization.  The prosecution should therefore be allowed to proceed to trial on the gang-related count, allegations, and enhancements alleged against Farley.  (See *Zemek v. Superior Court*, *supra*, 44 Cal.App.5th at p. 545 [" '[w]e will not set aside an information "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it" ' "].)

## DISPOSITION

A peremptory writ of mandate shall issue directing respondent superior court to vacate its order granting Farley's section 995 motion in part and to enter a new and different order denying the motion in its entirety.  The stay previously issued by this court shall be dissolved upon the issuance of the remittitur.

BROWN, P. J.


WE CONCUR:

STREETER, J.
SMILEY, J.*

_____

\* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30

Trial Court:      San Francisco City & County Superior Court

Trial Judge:      Hon. Rochelle East, Hon. Charles Crompton

Counsel:      Brooke Jenkins, District Attorney, Heather Trevisan, Nathan Quigley, and Natalie Fuchs, Assistant District Attorneys for Plaintiff and Petitioner.

No appearance for Respondent.

Peter Fitzpatrick for Real Party in Interest.

Peace and Justice Law Center, Sean Garcia-Leys as Amicus Curiae on behalf of Real Party in Interest.